UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCUS DEAN HIMLE,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 17-cv-03960-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 23

Plaintiff Marcus Dean Himle moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Himle not disabled and therefore denied his application for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 et seq. The Commissioner cross-moves to affirm. For the reasons stated below, the court denies Himle's motion for summary judgment and grants the Commissioner's motion for summary judgment.

## I. PROCEDURAL HISTORY

Himle filed applications for Title II and Title XVI benefits on August 27, 2013 and May 8, 2014, alleging disability beginning January 11, 2013. Administrative Record (A.R.) 161-162, 169-177. His claim was initially denied on February 7, 2014 and again on reconsideration on May 23, 2014. A.R. 105-110, 113-119. On June 16, 2014, Himle filed a request for a hearing before an Administrative Law Judge (ALJ). A.R. 120. ALJ Maxine R. Benmour held a hearing on November 18, 2015. A.R. 35-64.

After the hearing, ALJ Benmour issued a decision finding Himle not disabled. A.R. 15-30. The ALJ determined that Plaintiff has the following severe impairments: human immunodeficiency virus (HIV), depressive disorder, and anxiety disorder. A.R. 20. The ALJ found that Himle does not have an impairment or combination of impairments that meets one of

the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and that he retains the residual functional capacity (RFC) "to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, repetitive tasks with occasional contact with the public." A.R. 21-23.

Relying on the opinion of a vocational expert (VE) who testified that an individual with such an RFC could perform other jobs existing in the economy, including laundry worker, warehouse worker, and hand packager, the ALJ concluded that Himle is not disabled. A.R. 29-30.

The Appeals Council denied Himle's request for review on June 27, 2017. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Himle then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.      At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.      At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.     At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.     At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.     At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.     FACTUAL BACKGROUND

### A.     Overview of Himle's Medical History

Himle has a history of drug addiction, anxiety, and depression. Following a 2012 relapse of his addiction to meth, he attempted suicide in August 2013. Himle, who was homeless at the time, then received residential treatment and assistance from the Progress Foundation while he was attempting to obtain housing. A.R. 261, 265, 382. Upon admission, he was diagnosed with depression and meth dependency and assessed a GAF score of 35.[2] A.R. 264, 382. A treatment

---

[2] "GAF" stands for Global Assessment of Functioning. It is a scale ranging from zero to 100 that is used to rate "psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM–IV") at 32. The Ninth Circuit has noted that while "GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014).

A GAF score of 31 to 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as

note describes him as "suicidal, depressed, anxious, homeless & coming off of meth." A.R. 266.

Following regular therapy sessions, Himle was discharged from the Progress Foundation on September 18, 2013, and assessed a GAF score of 81.[3] A.R. 265; see A.R. 261-385. At discharge, he was oriented and well groomed, with "good" mood, bright affect, and good insight and judgment, and his motor activity and speech were within normal limits. A.R. 266. A counselor wrote that Himle was using coping skills to combat depression, and that he was no longer experiencing the problems he presented on admission, including depression and anxiety. A.R. 266.

After his discharge from the Progress Foundation, Himle resumed care with his physician, Daniel Toub, M.D., at Santa Rosa Community Health Centers. A.R. 387-524, 549-577. The record contains treatment notes by Dr. Toub from July 2011 through August 2015. *See id*. Dr. Toub's treatment notes consistently note that Himle's HIV was "stable with good adherence, tolerance, and efficacy" of antiretroviral medications. *See, e.g.*, A.R. 424, 428, 500, 549, 556, 570. Himle began counseling with Ilka de Gast, Psy.D., in September 2013. *See* A.R. 418 (treatment notes dated 9/12/2013). The records show that Himle also received four counseling sessions with a licensed clinical social worker, Cynthia Mattson, at Alexander Valley Healthcare from October 2014 through January 2015. A.R. 528-548.

### B. Himle's Testimony

Himle testified that he last worked in 2013. He stopped working because he was having difficulty regularly attending work due to a drug relapse and anxiety about his position at Wal-Mart. A.R. 39-40. He had worked at Wal-Mart since 2007, and held the positions of service writer, safety team leader, and training coordinator. A.R. 40-41. He was put on a leave of absence in January 2013 and terminated his employment in July 2013. A.R. 42. Himle has a GED. A.R.

---

work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM–IV at 34.

[3] A GAF score of 81 to 90 indicates "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." DSM–IV at 34.

39. Himle testified that he did not look for another job following his employment at Wal-Mart because he was "trying to get his life together," trying to "get sober and stay sober." A.R. 43. He has been clean and sober since August 8, 2013. A.R. 43.

Himle testified that he continues to have anxiety and depression. Himle testified that about four days a week, "I just don't have the gumption to get up and do my regular activities such as bathe or clean my house or do anything. I don't want to go outside. I don't want to deal with other people." A.R. 44. He feels that way for the whole day. A.R. 44. He testified that things happened during his childhood that he did not know how to deal with, and that that "turned into depression throughout [his] life," and that he used drugs "to not feel things." A.R. 44-45.

Himle has been seeing Dr. Ilka de Gast since August or September 2013 for appointments every two to three weeks. He is taking Zoloft for his depression and Trazodone at night to help him sleep. A.R. 45-46. The Trazodone helps "somewhat." Himle testified that he has "very vivid nightmares" or night terrors that interrupt his sleep every night, and that the Trazodone only lessens them. A.R. 46. The night terrors have become more intense in the last four or five years, although Himle testified that he has always had "more vivid nightmares than . . . normal." A.R. 46-47. He estimates that he has only two to three hours of uninterrupted sleep per night. A.R. 55. Himle believes that the night terrors are a side effect of his HIV medicine, Atripla, although he is not taking that medication any longer. A.R. 55.

Himle testified that he has anxiety attacks about once per week, and that he has panic attacks about once per week. The panic attacks can last a couple of hours, and Himle described helpful coping skills that he uses to deal with the panic attacks. A.R. 47-48.

Himle testified about side effects of his HIV medications. His medications cause abdominal issues, including diarrhea and constipation. He has diarrhea three or four times per week, for which he takes Imodium, which he testified helps. A.R. 49. He also experiences fatigue, and takes a two- to three-hour nap every day. A.R. 50. He has been seeing Dr. Danny Toub for his HIV since 2009. He sees Dr. Toub every two to three months. A.R. 50.

Himle lives alone in a studio apartment. He cooks for himself, does his own laundry, and does grocery shopping when he can get a ride to the store. A.R. 52-53. He has no problems with

personal care, such as showering and dressing, although he testified that twice a week "I don't do it because I'm just in a funk." A.R. 53. When he is "in a funk," he is able to get out of bed and "get to [the] computer" and "get to the couch," but does not shower, dress, or groom himself. A.R. 56.

Himle described a typical day as follows: he starts the day with his puppy running around in the garden. He prays and then calls his sponsor. He then does what "needs to be done," such as laundry or grocery shopping, if he feels up to it. A.R. 53. Twice a month he socializes with a community of individuals in recovery who live in Cloverdale. A.R. 53. They share a meal and then play a board game. A.R. 54. He also visits his mother in Santa Rosa at least once per month. A.R. 56.

**C.      HIV Questionnaire**

Himle completed an HIV Questionnaire on October 31, 2013. A.R. 213-216. He wrote that he was diagnosed with HIV in 2000 and that he has not been diagnosed with infection common to AIDS. A.R. 213. He wrote that walking and excessive physical movements cause fatigue, and that he required a one-hour nap every day. A.R. 213. He indicated that he has diarrhea two to three times per day and incontinence two times per week. A.R. 213. Himle wrote that he experiences night sweats every night, and that nightmares, noises, and wakefulness interrupt his sleep every night. He uses Trazodone as a sleep aid. A.R. 214. Himle wrote that he is currently taking Atripla, Celexa, Trazodone, and Atarax, and that side effects include "vivid dreams, diarrhea, neuropathy, disturbed sleeping." A.R. 215.

Himle wrote that he does not have difficulties grooming himself and does not need to rest while grooming. He is able to complete household chores, take public transportation to get around, walk for two blocks without resting, and prepare and cook his own meals. He also wrote that he is able to leave his home every day without assistance. A.R. 214. Himle noted that he is being treated for depression, which causes "isolative behavior." A.R. 215. However, he "[f]orces [him]self to attend meetings" and interact with others. A.R. 215.

In response to a question asking him to explain how he feels that his condition keeps him from working, Himle wrote, "unable to get out of bed, isolating and depressed. Uncontrolled

6

sadness and anxiety." A.R. 216.

### D.  Relevant Medical Evidence

#### 1.  Daniel Toub, M.D.

Himle's primary care physician, Daniel Toub, M.D., wrote a letter assessing Himle's functional limitations on September 17, 2014. A.R. 526-527. Dr. Toub wrote that Himle suffers from ongoing symptoms related to his HIV diagnosis such as chronic fatigue, leg spasms, and chronic lower back pain that exacerbates insomnia. A.R. 526. He also noted that Himle suffers from "chronic symptoms of depression and anxiety," including "uncontrolled symptoms of overwhelm," and overpowering anxiety which transitions into panic attacks. His triggers include dealing with the public, dealing with coworkers, and stressful work conditions. Dr. Toub wrote that Himle "experiences an overwhelming sense of doom on most days." A.R. 526.

Dr. Toub opined that Himle is markedly limited with regard to his daily activities, and requires rest after minimal activity. In addition to fatigue, Himle requires multiple breaks to complete tasks and needs naps of an hour or longer. Himle's problems with night terrors and nightmares interrupt his sleep and contribute to his fatigue, which persists despite naps. According to Dr. Toub, Himle "lacks the stamina to manage the daily requirements of even part-time work," which affects his ability to concentrate, maintain focus, and maintain the pace and performance required in a work setting. A.R. 526. Dr. Toub opined that Himle would likely see a decrease in his overall health with increased stress or activity. A.R. 526. Finally, he opined that Himle "will remain unable to handle the ongoing nature of work for at least the next 24-36 months, if not longer, due to his limitations." A.R. 527.

#### 2.  Ilka de Gast, Psy.D.

Himle's therapist, Ilka de Gast, Psy.D., wrote a letter regarding Himle's mental health on November 17, 2014. A.R. 578-579. She wrote that she had treated Himle in therapy since September 2013, and that his diagnoses include major depressive disorder and anxiety disorder. Dr. de Gast wrote that Himle's "symptoms of anxiety include frequent periods of intense overwhelm," and that his anxiety at times transitions into panic attacks. A.R. 578. Triggers include dealing with other people and dealing with coworkers and stressful work conditions. His

symptoms of depression "include hopelessness and an overwhelming sense of doom," which causes Himle to isolate and compensate with overeating. She also noted that he has made several suicide attempts. She opined that Himle's substance use was likely the result of self-medicating due to childhood abuse and lack of coping skills. A.R. 578.

Dr. de Gast also noted Himle's decreased energy, fatigue, concentration, and focus. She stated that these symptoms "markedly limit [Himle's] ability to maintain the pace of daily activities as well as his ability to work," and that they would mostly continue to limit Himle for the next 12 to 24 months "and possibly indefinitely." Finally, Dr. de Gast noted that Himle would likely experience a decline in his mental health "with any increase in stress and / or work related activity." A.R. 579.

### 3. State Agency Psychological Consultants

On February 3, 2014, state agency consultant Mark Berkowitz, Psy.D., reviewed the records, A.R. 65-75, and opined that Himle has no restriction in his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. A.R. 70. He opined that the records suggested some improvement in Himle's mental functioning with medication compliance and drug abstinence, and that he "can persist at work tasks that can be learned in up to three months with reduced public contact." A.R. 73.

On reconsideration, A.R. 77-88, state agency consultant Stephen Kleinman, M.D., opined that Himle is moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and complete a normal workday and workweek without interruptions from psychologically based symptoms." A.R. 85. He concluded that Himle "can work at some jobs that are easy to learn and remember." A.R. 84.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the

8

Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.      ISSUES PRESENTED

Himle argues that the ALJ 1) erred in weighing the medical opinions; 2) erred in finding that Himle does not meet or equal a listing; and 3) erred in assessing his credibility.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.      DISCUSSION

### A. Weighing of the Medical Opinions

The ALJ discussed the medical evidence and stated that she gave great weight to the state agency psychological consultants and little weight to the opinions of treating physicians Drs. Toub and de Gast. A.R. 26-27. Himle argues that the ALJ erred in giving little weight to the opinions of Drs. Toub and de Gast.

#### 1.  Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the

doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).

This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other

independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2.    Analysis

Dr. Toub opined in September 2014 that Himle is markedly limited with regard to his daily activities, and that he "lacks the stamina to manage the daily requirements of even part-time work." A.R. 526. In November 2014, Dr. de Gast opined that Himle's decreased energy, fatigue, concentration, and focus "markedly limit [Himle's] ability to maintain the pace of daily activities as well as his ability to work." A.R. 579. The ALJ gave these opinions little weight in favor of the state agency psychological consultants, who opined that Himle can perform simple tasks with limited contact with the public. A.R. 26. Given these contradictions, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject the opinions of Drs. Toub and de Gast. *Lester*, 81 F.3d at 830.

### a.    Dr. de Gast

The ALJ discussed Dr. de Gast's November 2014 opinions that Himle's decreased energy and fatigue and his diminished ability to concentrate and focus markedly limit his ability to maintain the pace of daily activities, as well as his ability to work, for the next 12 to 24 months and possibly indefinitely. She also discussed Dr. de Gast's opinion that Himle would likely experience a decline in his mental health with an increase in stress and/or work related activity.

The court finds that the ALJ provided "specific and legitimate reasons" supported by substantial evidence to discount Dr. de Gast's opinion. First, the ALJ wrote that she was according little weight to Dr. de Gast's opinion on the ground that it was inconsistent with the medical evidence, since Himle's records showed an improvement in mental health, rather than a decline. A.R. 27 (citing A.R. 496). Specifically, the ALJ wrote that Himle reported on numerous occasions that he was "doing much better subsequent to his suicide attempt" and that he

11

consistently denied experiencing side effects from his medication.  A.R. 27.

While Dr. de Gast's treatment notes indicate that Himle experienced some setbacks following his suicide attempts, they largely reflect improvement in his overall mental health.  For example, on October 9, 2013, Himle reported that he had found housing, and Dr. de Gast wrote that Himle "is excited and happy about it."  A.R. 402.  On December 17, 2013, approximately four months after Himle's suicide attempt and extended stay at the Progress Foundation, Himle reported to Dr. de Gast that he had just taken on the position of secretary for the NA fellowship in Cloverdale, about which he was excited.  A.R. 517.  On January 7, 2014, he reported that his living situation was "going well," and later that month, on January 29, 2014, Himle told Dr. de Gast that he "was in a good space emotionally" and that "he thinks that he is taking all the steps necessary to help him move forward."  He was "happy with his housing" and "becoming more interested in teaching and will explore the possibility of going back to school."  A.R. 510, 512.  Dr. de Gast's March 12, 2014 treatment notes indicate that Himle "said he is doing quite well currently," and that he was continuing his sobriety and attending NA and AA meetings.  A.R. 496.

Other than Dr. de Gast's November 2014 opinion, the record does not contain evidence of Dr. de Gast's treatment of Himle, such as treatment notes, for the period between April 2014 and April 2015.  On May 5, 2015, Himle reported to Dr. de Gast that he was "having a hard time with his depression and his weight," but he also reported that "his dog remains a total joy to him and helps him to get out of the house."  A.R. 559.  Treatment notes from a July 16, 2015 session indicate that Himle talked about "trying to get out of the house and be more social" and being grateful for his dog.  A.R. 566.  On August 20, 2015, Himle reported to Dr. de Gast that "he would like to go back to school to become a drug and alcohol counselor or work at Progress Sonoma."  A.R. 574.

The ALJ further noted that Dr. de Gast's opinion was inconsistent with her own treatment notes, which reflect the results of Himle's mental status examinations.  According to the ALJ, Dr. de Gast's treatment notes consistently reflect that Himle's thought processes were intact, his thought content was logical and coherent, and that he did not have any memory problems.  A.R. 27 (citing A.R. 400, 402, 416, 419, 496, 510, 512, 517, 521, 523, 559, 564, 566, 568, 572, 576).

While Dr. de Gast occasionally noted that Himle's mood was "melancholy" or "depressed, anxious," and that his affect was "broad, anxious" or "sad, anxious," A.R. 400, 402, 416, 419, 496, 510, 559, 564, 566, 568, 572, 576, the remainder of the results of the mental status examinations were consistently normal. Further, the record supports the ALJ's observation that Himle consistently reported to his treatment providers that he was not experiencing side effects from his medications. A.R. 27; *see, e.g.*, 405, 422, 425, 427, 429, 432, 435, 446, 454, 459, 550, 553, 557, 562.

The court is mindful of the Ninth Circuit's guidance that "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). "They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Id*. The Ninth Circuit has cautioned that it is "error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id*. However, in this case, Dr. de Gast's therapy records support the ALJ's observation that Himle's condition was improving over time. There is little in those records to support Dr. de Gast's conclusion that Himle was markedly limited in his ability to work, and that such limitation would continue for 12 to 24 months or indefinitely. The court finds that the ALJ did not err with respect to Dr. de Gast's opinion.

### b.    Dr. Toub

The ALJ next discussed Dr. Toub's opinions about Himle's mental health and physical limitations, including his opinion that Himle cannot complete tasks without multiple breaks and requires naps of an hour or longer, and that Himle's fatigue affects his ability to concentrate and maintain pace in a work setting. A.R. 27.

The ALJ listed several reasons for discounting his opinion. With respect to Himle's mental health limitations, the ALJ noted that Dr. Toub is not a psychiatrist "and, thus, his assertions regarding the claimant's mental health limitations are given little weight." A.R. 27.

13

United States District Court
Northern District of California

However, the Ninth Circuit has held that where a treating physician provides "treatment for [a] claimant's psychiatric impairment, including the prescription of psychotropic medication[,] [h]is opinion constitutes 'competent psychiatric evidence' and may not be discredited on the ground that he is not a board certified psychiatrist." *Lester*, 81 F.3d at 833. Dr. Toub prescribed medication to treat Himle's mental health impairments. *See, e.g.*, A.R. 404 (prescribing hydroxyzine, citalopram, trazodone for depression), 421, 519, 557. He also regularly noted Himle's mental health diagnoses, *see, e.g.*, A.R. 404, 421, 505, 519, 557, and periodically assessed the severity of Himle's depression. *See, e.g.*, A.R. 506 (2/3/2014 visit: depression screening, "minimal depression"), 550 (1/29/2015 visit: depression screening, "moderate depression"). Further, the ALJ's statement that Himle received only "minimal treatment for depression and anxiety" is not entirely accurate. Following his suicide attempt, Himle took prescription medications to combat depression and anxiety and regularly received mental health treatment from Dr. de Gast and others for at least two years. *See* A.R. 387-495, 496-524, 528-548, 561-577.

The ALJ also wrote that the record shows that Himle's condition improved significantly following his suicide attempt. A.R. 27. As discussed above in connection with Dr. de Gast's treatment records, the court agrees. While Himle faced some setbacks, his mental condition improved with regular treatment, as Dr. Toub himself noted. *See* A.R. 505 (2/3/2014 visit with Dr. Toub, depression "significantly improved. Psychotherapy is helping, Medications helping"). Although Dr. Toub stated in his opinion that Himle reported "an overwhelming sense of doom on most days," A.R. 526, by the end of the following month, LCSW Mattson described Himle as only "mildly depressed." A.R. 529. Moreover, as the ALJ noted, Dr. Toub's opinion is inconsistent with his own treatment notes. The court's review of the record evidence revealed no treatment notes or other records by Dr. Toub supporting his assessment that Himle "is overpowered by his anxiety, which quickly transitions into panic attacks," or that Himle faces a number of triggers, including "dealing with the public, with co-workers, and stressful work conditions," and Himle himself cites no such records in his motion. On balance, the court concludes that the ALJ did not err with respect to her decision to assign little weight to the portions of Dr. Toub's opinions addressing his mental health limitations.

14

Next, the ALJ discounted the portion of Dr. Toub's opinion regarding the effects of Himle's fatigue. Dr. Toub wrote that Himle is "markedly limited with regard to his daily activities, and requires rest after minimal activity"; requires naps of an hour or more; is fatigued due in part to night terrors and nightmares, which interrupt his sleep; and lacks stamina to manage the requirements of even part time work. A.R. 526. The ALJ wrote that Dr. Toub's statements about Himle's need for naps "are not reflected in the record, and neither are the claimant's night terrors or nightmares." A.R. 27. She also wrote that Dr. Toub's opinion was inconsistent with his treatment notes and examinations, that Dr. Toub "consistently noted the claimant's HIV to be stable with good adherence," and that Himle's CD4 counts were greater than 500. A.R. 27. Having carefully reviewed the evidence, the court concludes that the ALJ did not err with respect to this portion of Dr. Toub's opinion.

It is not clear whether the ALJ intended to connect her observations that Himle's HIV was "stable with good adherence" and that he had sufficient CD4 counts to Dr. Toub's opinions about the effects of Himle's fatigue. In any event, the record supports her statement about the stability of his HIV and the sufficiency of his CD4 counts. *See, e.g.*, A.R. 424, 428, 500, 549, 552, 556, 561, 570. On the issue of fatigue, the ALJ correctly noted that Himle's need for naps is not reflected in any of Dr. Toub's treatment notes. On the other hand, the statement that Himle's night terrors or nightmares are not reflected in the record is inaccurate. For example, during two appointments in February 2014, Dr. Toub noted Himle's night terrors and depression as a side effect of a certain antiretroviral medication, Efavirenz. A.R. 500, 504. However, the notes show that Dr. Toub promptly moved Himle off Efavirenz and onto Stribild, *see* A.R. 500, 504, and Dr. Toub's records contain no further mention of night terrors or nightmares following that switch. On August 20, 2015, Dr. Toub noted that Himle had experienced "[s]table night sweats for years." A.R. 570. This is the only reference to night sweats in Dr. Toub's treatment notes. It is not clear what Dr. Toub meant by describing Himle's night sweats as "stable," but even if the term means "regular," the single observation in one medical record does not support his opinion that Himle requires rest after even minimal activity and requires naps of an hour or more.

In light of Dr. Toub's own records, which contain only limited references to Himle's

15

difficulties with sleep, the court finds that the ALJ did not err in rejecting Dr. Toub's opinions regarding the impact of his fatigue and difficulty sleeping.

**B. The ALJ's Determination that Himle's Impairments Did Not Meet or Equal a Listing**

Himle next argues that the ALJ erred in finding that Himle's combined impairments do not meet the criteria of Listing 14.08 or equal a listing.

In her opinion, the ALJ stated,

> The undersigned has carefully considered Listing 14.08 for human immunodeficiency virus (HIV) infection which requires: bacterial infections; fungal infections; protozoan or helminthic infections; viral infections; malignant neoplasms; conditions of the skin or mucous membranes; hematologic abnormalities; neurological abnormalities; HIV wasting syndrome; diarrhea; cardiomyopathy; nephropathy; other infections resistant to treatment or requiring hospitalization or intravenous treatment; or, repeated manifestations of HIV infection with marked restriction of one of the following: activities of daily living, or difficulties in maintaining social functioning, or difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. The record is devoid of such evidence. Accordingly, Listing 14.08 is not satisfied.

A.R. 21-22. The ALJ then discussed the criteria of listings 12.04 and 12.06, and discussed in detail Himle's limitations in activities of daily living; social functioning; and concentration, persistence, or pace. A.R. 22. She found mild restrictions in activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence, or pace, and concluded that Himle does not meet the criteria of listings 12.04 and 12.06. A.R. 22.

At the third step of the sequential evaluation process, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 and meets the duration requirement, the ALJ will find that the claimant is disabled. 20 C.F.R. § 404.1520(d). The claimant bears the burden of proving that an impairment or combination of impairments meets or equals the criteria of a listing. *Tackett*, 180 F.3d at 1100. "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). Generally, a "[a] boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listing, *id*.; *see also*,

United States District Court
Northern District of California

*e.g., Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990) (noting that ALJ's unexplained finding at step three was reversible error), unless the ALJ's discussion of the relevant medical evidence adequately supports the conclusion. *Lewis*, 236 F.3d at 513.

Himle argues that the ALJ erred because the record contains medical evidence from his treating physicians that shows that he meets the criteria of Listing 14.08. Listing 14.08(K) states:

> 14.08 Human immunodeficiency virus (HIV) infection. With documentation as described in 14.00F and one of the following:
>
> K. Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.08A–J, but without the requisite findings for those listings (for example . . . diarrhea not meeting the criteria in 14.08I), or other manifestations (for example . . . muscle weakness, cognitive or other mental limitation) resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
> 2. Limitation in maintaining social functioning.
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1. Himle argues that his HIV diagnosis is documented, and that the record contains medical evidence from his treating physicians documenting severe fatigue, night sweats, insomnia, nausea, and diarrhea due to HIV. He also argues that treating physicians Drs. Toub and de Gast found marked limitation in his activities of daily living and social functioning.

The court finds no error with respect to the ALJ's findings regarding Listing 14.08. The listing requires "[r]epeated . . . manifestations of HIV infection . . . resulting in significant, documented symptoms or signs" *and* marked limitation in activities of daily living; social functioning; or deficiencies in concentration, persistence, or pace. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Although the ALJ provided no discussion of Himle's manifestations of HIV infection in this section, she discussed at length her finding that Himle is not markedly limited in any of the three required categories under the listing. *See* A.R. 22. Himle disputes these findings based on the opinions of Drs. Toub and de Gast, but the ALJ gave their opinions little weight, and as discussed above, the court finds no error in the ALJ's weighing of the medical evidence. Further,

17

state agency psychological consultants Drs. Berkowitz and Kleinman both assessed Himle's limitations under these three categories and found no more than mild to moderate limitations in any category.  *See* A.R. 70, 83-84.

The court also concludes that the ALJ did not err in failing to consider whether Himle's combined impairments "equal" a listing.  According to Himle, the ALJ found non-severe impairments of obesity and drug addiction, but failed to include those impairments "in any analysis which could be interpreted as a multiple impairments analysis."  Pl.'s Mot. 13.  Here, there is no evidence that Himle's obesity or drug addiction caused any functional limitations or exacerbated other impairments.  Moreover, Himle "does not proffer the required specific explanation as to how the medical evidence shows [his] impairments are medically equivalent" to Listing 14.08.  *See Noah v. Berryhill*, 732 Fed. Appx. 520, 521 (9th Cir. 2018) (finding ALJ did not err by "not articulating a proper rationale for finding" claimant's impairments did not equal a listing where claimant "did not present a specific theory as to how her conditions medically equaled" the listing).  "An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."  *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  Accordingly, the ALJ's step three determination was without error.

### C.    The ALJ's Credibility Determination

Himle next challenges the ALJ's determination that he was not fully credible.

#### 1.  Legal Standard

In general, credibility determinations are the province of the ALJ.  "It is the ALJ's role to resolve evidentiary conflicts.  If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld."  *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted).  An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)).  Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons."  *Reddick*, 157 F.3d at 722 (citation omitted).  If an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific

reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (rejecting Commissioner's challenge to "specific, clear, and convincing" legal standard for rejecting claimant's testimony in the absence of malingering).

### 2. Analysis

The ALJ found that Himle's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." A.R. 27. Since the ALJ did not conclude that Himle was a

malingerer, she was required to provide "specific, clear and convincing" reasons to discount his testimony.

The ALJ gave several reasons for discounting Himle's testimony. Having carefully reviewed the ALJ's opinion and the record evidence, the court concludes that the ALJ's credibility determination satisfies the "specific, clear and convincing" standard. First, the ALJ noted that Himle's reported activities of daily living were "inconsistent with his allegations of constant fatigue and inability to get out of bed." A.R. 27. She pointed to Himle's October 2013 HIV questionnaire, in which he reported that he has no difficulties while grooming himself, does not have to rest during grooming, completes his own household chores, and does not require any assistance preparing his meals. A.R. 27-28 (citing A.R. 213-216). He further indicated that is able to take public transportation and leave his home every day without assistance. A.R. 214. At the hearing, Himle confirmed that he lives alone, cooks for himself, does his own laundry, and does his own grocery shopping. He also testified that he has no problems showering and dressing himself. A.R. 52-53. He starts the day by going outside with his dog, contacts his sponsor, takes care of what "needs to be done," and regularly socializes with others. A.R. 53-54. Based on this evidence, the ALJ reasonably found that Himle's daily activities diminished his credibility about his limitations.

The ALJ next wrote that "the degree of pain and fatigue alleged by the claimant is not supported by the objective medical evidence, which indicates an attempt by the claimant to exaggerate the severity of his symptoms." A.R. 28. Further, she noted that despite Himle's allegations of various side effects of his medications, which include abdominal issues and fatigue, "the medical records, such as office treatment notes, do not corroborate those allegations." A.R. 28. As discussed above, Himle's primary care doctor, Dr. Toub, made only limited references in his treatment notes to Himle's difficulties with sleep and fatigue, and no reference at all to Himle's need for naps. Following Dr. Toub's notation in February 2014 of Himle's night terrors and depression as a side effect of an antiretroviral medication, Dr. Toub promptly changed Himle's medications. Dr. Toub's treatment notes contain no further mention of night terrors or nightmares after that point. *See* A.R. 500, 504. Importantly, Dr. Toub's treatment notes consistently

document Himle's *denial* of side effects from his medications. *See* A.R. 405, 422, 425, 427, 429, 432, 435, 446, 454, 459, 550, 553, 557, 562. Himle also testified that he had experienced sleep interruptions for "[m]ost of [his] life," A.R. 55, but while living at the Progress Foundation, he was subject to hourly bed checks every night and the treatment notes consistently reflect that he slept through the night nearly every night. *See* A.R. 274, 277, 280, 284, 287, 297, 300, 302, 304, 307, 310, 313, 316, 319, 321, 322, 328, 331, 335, 338, 342.

The court concludes that the ALJ's interpretation of the record was reasonable and that she gave specific, clear and convincing reasons for discounting portions of Himle's testimony, and those reasons were supported by substantial evidence. The court finds no error with respect to the ALJ's credibility assessment.

### D. The ALJ's Hypothetical to the VE

Finally, Himle asserts that the ALJ's hypothetical question to the VE was incomplete because it did not incorporate the marked limitation in pace found by Dr. de Gast. Pl.'s Mot. 23. This argument is a variation of Himle's argument about the ALJ's weighing of the medical opinions. As discussed above, the court finds that the ALJ did not err in this respect, including rejecting Dr. de Gast's opinions about Himle's functional limitations. Accordingly, the ALJ did not err in failing to include the limitations assessed by Dr. de Gast in the hypothetical to the ALJ.

## VII. CONCLUSION

For the foregoing reasons, Himle's motion for summary judgment is denied. The Commissioner's motion for summary judgment is granted.

**IT IS SO ORDERED.**

Dated: September 7, 2018



Donna M. Ryu
United States Magistrate Judge